UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDRE LAMAR LEARY,  :
:
    Plaintiff,  :
:
    v.  :    CASE NO. 3:17cv1014(DFM)
:
NANCY A. BERRYHILL, ACTING  :
COMMISSIONER OF SOCIAL SECURITY  :
ADMINISTRATION,  :
:
    Defendant.  :

RULING AND ORDER

The plaintiff, Andrew Lamar Leary, seeks judicial review pursuant to 42 U.S.C. § 405(g) of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income. Pending before the court are the plaintiff's motion to reverse the Commissioner's decision (doc. #21) and the Commissioner's motion to affirm the decision. (Doc. #26.) For the reasons set forth below, the plaintiff's motion is denied and the defendant's motion is granted.[1]

I. Administrative Proceedings

On October 17, 2013, the plaintiff applied for supplemental security income alleging that he was unable to work due to

---

[1] This is not a recommended ruling. The parties consented to the jurisdiction of a magistrate judge and on January 12, 2018, the case was transferred to the undersigned. (Doc. #16.)

depression, bipolar disorder, anxiety, and back and neck injuries. (R. at 80.) The Social Security Administration denied the plaintiff's application initially and on reconsideration. The plaintiff requested a hearing before an Administrative Law Judge. A hearing was held on December 29, 2015, at which the plaintiff, represented by counsel, and a vocational expert testified. On February 3, 2016, the ALJ issued a decision finding that the plaintiff was not disabled under the Social Security Act. On April 27, 2017, the Appeals Council denied the plaintiff's request for review. This action followed.

II. Facts and Legal Standard

The court assumes the parties' familiarity with the plaintiff's medical history (summarized in a stipulation of facts filed by the parties, doc. #21-2, which are adopted and incorporated herein by reference), and the five sequential steps used in the analysis of disability claims. The court cites only those portions of the records and the legal standard necessary to explain this ruling.

III. The ALJ's Decision

The ALJ first determined that the plaintiff had not engaged in substantial gainful activity since October 17, 2013, the alleged onset date. At step two, the ALJ found that the plaintiff had severe impairments of "organic brain syndrome, substance abuse disorder (drugs and alcohol), anxiety disorder, and affective

2

disorder." (R. at 17.) At step three, the ALJ found that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (R. at 18.) Specifically, the ALJ found that the plaintiff's impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 (affective disorders), 12.05 (intellectual disability), 12.06 (anxiety disorders) and 12.09 (substance addiction disorders.) The ALJ next found that the plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) but with the limitations that he could "only frequently stoop, crouch, and crawl"; could "perform only simple, routine, and repetitive tasks but not any production pace"; and could "deal with changes in a work setting limited to simple work-related decisions." (R. at 21.) At step 4, the ALJ found that the plaintiff had no past relevant work. At step 5, after considering plaintiff's age, education, work experience, residual functional capacity, and the testimony of a vocational expert, the ALJ found that there existed jobs in significant numbers in the national economy that the plaintiff could perform. (R. at 30.) Accordingly, the ALJ determined that the plaintiff was not disabled within the meaning of the Act from October 17, 2013, through the date of the decision, February 2016. (R. at 30.)

3

IV. Standard of Review

This court's review of the ALJ's decision is limited. "It is not [the court's] function to determine de novo whether [the plaintiff] is disabled." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). The court may reverse an ALJ's finding that a plaintiff is not disabled only if the ALJ applied incorrect legal standards or if the decision is not supported by substantial evidence. Brault v. Soc. Sec. Admin., 683 F.3d 443, 447 (2d Cir. 2012). In determining whether the ALJ's findings are supported by substantial evidence, "'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)). "Substantial evidence is more than a mere scintilla. . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447 (quotation marks and citations omitted). It is "a very deferential standard of review-even more so than the clearly erroneous standard. . . . The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 447-48. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be

4

given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted). See also Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013)("[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision.")(citations omitted)(emphasis in original).

V. Discussion

The plaintiff argues that the ALJ's finding at step 3 that the plaintiff does not meet Listing 12.05C, which sets forth the conditions under which a person is intellectually disabled, is not supported by substantial evidence.[2]

The plaintiff bears "the burden of proof at step three to show that [his] impairments meet or medically equal a Listing." Whitley v. Colvin, No. 3:17CV121(SALM), 2018 WL 1026849, at *8 (D. Conn. Feb. 23, 2018). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990)(emphasis in original).

Listing 12.05C states in pertinent part as follows:

---

[2]The plaintiff does not contest the ALJ's findings at any other steps in the sequential analysis.

5

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied ...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .[3]

"An applicant's burden to establish per se disability under this Listing is twofold." Bushey v. Berryhill, 739 F. App'x 668, 672 (2d Cir. 2018). "First, the applicant must establish the requirements of Subsection C itself — i.e., [a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. "Second, the applicant must carry 'h[is] separate burden of establishing that [he] suffers from qualifying deficits in adaptive functioning, and that those deficits initially manifested . . . before age 22" and continue

---

[3]The listing was subsequently revised. Effective January 17, 2017, the Social Security Administration amended the criteria in the listings used to evaluate claims of intellectual disability and eliminated Listing 12.05C. See Soc. Sec. Admin., Revised Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The court refers to the version of 12.05C that was in effect at the time the ALJ issued his decision. See id. at *66139 n.1 ("[w]e expect that federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions").

6

during the claim period. Id. (quotation marks and citations omitted).

Here, the ALJ concluded that the plaintiff did not meet Listing 12.05C because he failed to show deficits in adaptive functioning. (R. at 19.)

"Adaptive functioning refers to an individual's 'ability to cope with the challenges of ordinary everyday life.'" Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012)(internal brackets omitted) (quoting Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007)). An "applicant's inadequate adaptive functioning must arise from [his] cognitive limitations, rather from a physical ailment or other infirmity." Talavera, 697 F.3d at 153. "While a qualifying IQ score may be prima facie evidence that an applicant suffers from significantly subaverage general intellectual functioning, . . . there is no necessary connection between an applicant's IQ scores and [his] relative adaptive functioning." Talavera, 697 F.3d at 153. Thus, "'persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job,' and are therefore not disabled, if their adaptive functioning is sufficiently intact." Talavera, 697 F.3d at 151 (quoting Novy, 497 F.3d at 709). "[P]ersonal characteristics consistent with adequate adaptive functioning[] include[e] the ability to navigate public transportation without assistance, engage in productive social relationships, and manage [his or] her own personal finances; a

7

facility with the use of computers; and the display of fluent speech, coherent and goal-directed thought processes, and appropriate affect." Talavera, 697 F.3d at 154 (internal quotation marks omitted.) See, e.g., Bushey v. Berryhill, 739 F. App'x 668, 672 (2d Cir. 2018) (plaintiff lacked qualifying deficits in adaptive functioning because – despite a valid full-scale IQ score of 66 – plaintiff was able to function on a daily basis, maintain a schedule, groom and dress herself, and care for children); Young v. Berryhill, No. 3:17CV970(SALM), 2018 WL 2947860, at *12 (D. Conn. June 12, 2018)("[C]ourts have held that if one is able to satisfactorily navigate activities such as living on one's own, taking care of children without help sufficiently well that they have not been adjudged neglected, paying bills, and avoiding eviction, one does not suffer from deficits in adaptive functioning.") (quotation marks and citations omitted); Rodriguez v. Berryhill, No. 3:16CV1494(VLB), 2018 WL 1660552, at *7 (D. Conn. Apr. 5, 2018)(substantial evidence supported ALJ's finding that plaintiff did not suffer from deficits in adaptive functioning where "Plaintiff was independent in her personal hygiene, performed household chores, managed her finances, cleaned her house, washed clothes, and cooked on a daily basis."); Hoyt v. Colvin, No. 15-CV-95(VEC)(KNF), 2016 WL 3681425, at *6 (S.D.N.Y. Mar. 4, 2016)(evidence that the plaintiff did not know how to drive, frequently got lost when using public transportation, could

8

not cook, and read a "little bit" but mostly did not understand what she is reading, was not sufficient to satisfy plaintiff's burden at step three where the record also indicated that the plaintiff lived on her own, could perform basic household duties, such as cooking, cleaning and laundry, travel independently by public transportation, follow a shopping list, pay her bills, and maintain "proper grooming"); Edwards v. Astrue, No. 5:07-CV-898(NAM/DEP), 2010 WL 3701776, at *3 (N.D.N.Y. Sept. 16, 2010)("A plaintiff who can dress, bathe, manage money, communicate effectively, do simple math and take care of personal needs does not suffer from adaptive deficits.").

In support of his argument that he suffered from the requisite deficits in adaptive functioning, the plaintiff points to his IQ score of 64, demonstrating that his intellectual functioning was "extremely low," and the fact that he participated in special education classes, repeated grades and dropped out of school. In addition, the plaintiff emphasizes neuropsychologist Dr. Badillo Martinez's findings that the plaintiff's intellectual abilities, fund of knowledge, attention, memory and speed of processing were markedly below average and that he had a "poverty of expression." (R. at 448.)

Other evidence in the record, however, supports the ALJ's conclusion that the plaintiff failed to demonstrate deficits in adaptive functioning as required by Listing 12.05C. The plaintiff

9

lives with his girlfriend and preschool age daughter in an apartment. He and his girlfriend both take care of their daughter. (R. at 46.) The plaintiff uses public transportation and can read a bus schedule. (R. at 8, 62.) He testified that he is capable of grocery shopping on his own, as long as he has a list. (R. at 47.) He is able to do housework and goes to the laundromat with his girlfriend. (R. at 47.) When the plaintiff went to SSA, the SSA examiner observed that he was "neatly dressed." (R. at 84.) The plaintiff can read a newspaper article although at times, he does not understand it completely. (R. at 63.) A mental status assessment by Cheryl Ellis, Psy.D, indicated that the plaintiff arrived at the session on time, was casually dressed, and had "no observable psychomotor retardation or agitation." (R. at 458.) Dr. Ellis observed that the plaintiff's speech was "clear and goal-directed," and his thoughts were "concrete and clear." (R. at 459.) The plaintiff stated that he did not need assistance with daily living activities such as bathing, dressing, and house maintenance. (R. at 460.) Dr. Ellis found that the plaintiff had poor insight but "appeare[ed] to have no difficult maintaining attention and concentration" and had "the clear ability to reason and understand." (R. at 460.) She further found that he was "able to follow simple instructions, has an awareness of hierarchy, and knowledge of how to interact with others." She observed that he had an "appropriate interaction style" and "some adaptation

10

skills." (R. at 460.) Dr. Ellis opined that the plaintiff was capable of managing his own funds.

Dr. Martinez conducted a psychological evaluation for the Bureau of Rehabilitation Services to "assess [the plaintiff's] learning potential" and "assist with vocational planning." (R. at 447.) Dr. Martinez noted that the plaintiff arrived on time and presented with a neat and clean appearance. (R. at 448.) After testing, Dr. Martinez determined that the plaintiff's intellectual abilities, attention, memory, speed of processing and fund of knowledge were markedly below average. Notwithstanding, Dr. Martinez did not opine that the plaintiff was unable to work. Rather, she found that the plaintiff had the "capacity to learn and work[] with repetitive activity," although he would "require significant support and ample practice until he has fully learned the task. He will require assistance finding employment, filling out applications, as it is unlikely that he will be able to do so independently." (R. at 452.) She further stated that "before working, he will require a period of training, with much supervision, possibly a job coach to provide support. He requires assistance and interfacing with the employer to ensure they are aware of his limitations. A gradual transition to the work place will facilitate success." (R. at 452.)

Two state consultative professionals, Katrin Carlson, Psy.D, and Christopher Leveille, Psy.D, who reviewed the plaintiff's

11

file, opined that he had a mild restriction in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. (R. at 87, 100.) Dr. Carlson determined that the plaintiff's "speed of processing and comprehension of complex tasks could be expected to be below average given his level of intellectual functioning." (R. at 89.) Dr. Carlson thought that the plaintiff would have "difficulty with multistep tasks due to his cognitive limitations" but that he could "carry out simple one or two step tasks for two hour periods in a normal work day." (R. at 89.)

A psychosocial assessment by Family Services of Greater Waterbury indicated that the plaintiff was well groomed, cooperative, and had intact thought process. (R. at 466-68.) He presented as oriented but "really sad." (R. at 468.) The plaintiff was assessed with moderate depression and anxiety, moderate thinking/cognitive/memory/concentration problems, and moderate impairment in activities of daily living. (R. at 470.)

APRN Jill Jacomin of the Family Services of Greater Waterbury saw the plaintiff monthly for medication management for depression and anxiety. She described the plaintiff as alert, oriented, neatly groomed with appropriate eye contact. He had fair to poor memory and insight; clear, coherent slowed speech; concrete and

12

goal-oriented thoughts; and an adequate fund of knowledge.  (R. 790, 794, 798, 801 805, 807, 810, 813, 815, 817, 819.)

After a careful review of the record, the court concludes that substantial evidence supports the ALJ's finding that the plaintiff does not have deficits in adaptive functioning.

VI.  Conclusion

For these reasons, the plaintiff's motion to reverse and/or remand the Commissioner's decision (doc. #21) is denied and the defendant's motion to affirm the Commissioner's decision (doc. #26) is granted.

SO ORDERED at Hartford, Connecticut this 11th day of December, 2018.

```
         _____/s/_____
                  Donna F. Martinez
                  United States Magistrate Judge
```